OPINION
{¶ 1} Defendant-appellant, Jerry Tipton, appeals from two judgments of conviction entered by the Franklin County Court of Common Pleas. For the following reasons, we affirm.
 {¶ 2} On June 4, 2004, defendant was indicted on one count of aggravated robbery, a violation of R.C. 2911.01; two counts of robbery, violations of R.C. 2911.02; four counts of kidnapping, violations of R.C. 2905.01; one count of felonious assault, a violation of R.C. 2903.11; one count of attempted murder, a violation of R.C. 2923.02 as it relates to R.C. 2903.02;[1]
and one count of having a weapon under a disability, a violation of R.C. 2923.13. Each count, except for the last, included a firearm specification. All of the counts stemmed from defendant's alleged participation in the May 24, 2004 armed robbery of a BP gas station located at the intersection of I-71 and State Route 62 in Mount Sterling, Ohio.
 {¶ 3} On August 24, 2004, defendant was indicted on one count of aggravated robbery, a violation of R.C. 2911.01; one count of robbery, a violation of R.C. 2911.02; and two counts of kidnapping, violations of R.C. 2905.01. Each count included a firearm specification. This second indictment also arose from defendant's alleged involvement in a May 24, 2004 armed robbery of a gas station; namely, the robbery of a Sunoco gas station located at the intersection of I-71 and State Route 56 in Orient, Ohio.
 {¶ 4} The day after defendant was indicted for the Sunoco robbery, the state moved pursuant to Crim.R. 13 to try the two indictments together, arguing that a joinder was appropriate because both matters were part of the same course of criminal conduct. The trial court granted the state's motion. Defendant responded with a motion to sever, in which he argued that he would be prejudiced by the joinder of the two cases. Immediately before trial, the trial court denied defendant's motion to sever. The trial court concluded that the offenses contained in the indictments were of the same or similar character and, because they arose from robberies committed only minutes apart, they were part of the same course of conduct. Further, the trial court found that the jury was unlikely to confuse the evidence and convict defendant for the Sunoco robbery solely on the strength of the evidence related to the BP robbery.
 {¶ 5} At trial, the state first presented testimony from the witnesses to the Sunoco robbery. Terri Lee, a cashier at the Sunoco, testified that on the evening of May 24, 2004, a tall, well-built man wearing a fishing hat came into the Sunoco store and asked if it sold wine. After Lee responded that it did not, the man walked around the counter, pointed a silver handgun at Lee, and demanded that she open the drawer of her cash register. Lee complied. The man then told her to open the safe, but Lee said she could not do so because she did not know the combination. At some point during this exchange, Kandy Gollihue, a customer at the Sunoco, approached the counter. The man raised his gun, which Gollihue described as a silver-colored handgun, and briefly pointed it at Gollihue. Later, Gollihue viewed a photographic array and identified the man holding the gun as John Webb.
 {¶ 6} After collecting the money from the cash register, Webb stole a pair of sunglasses from a counter display and left. As Webb was leaving, Raymond Brown, another Sunoco employee, exited the store's walk-in cooler. Unaware of the robbery, Brown did not pay much attention to Webb, except to note that he was wearing a fishing hat. Neither Lee, Gollihue, nor Brown saw what Webb did or where he went after he left the store.
 {¶ 7} As soon as Webb left the Sunoco, Lee telephoned 911. Douglas Crabbe, a lieutenant with the Madison County Sheriff's Office, arrived at the Sunoco at 6:28 p.m. — four minutes after Lee's 911 call. Upon entering the store, Crabbe learned from the three witnesses that the robber was a large white male, wearing a red shirt, tan shorts, and a fishing hat. Leaving his deputy to continue interviewing the witnesses, Crabbe stepped outside to telephone the Franklin County Sheriff's Office to report the robbery. During this telephone call, the Franklin County Sheriff's Office connected Crabbe to a deputy on the scene of an armed robbery that had just occurred at a BP gas station that was located only one exit and approximately ten miles north of the Sunoco's exit.
 {¶ 8} Not only did the BP robbery occur nearby and soon after the Sunoco robbery, it also unfolded similarly. At 6:32 p.m., a large, well-built white man wearing a fishing hat[2]
entered the BP store, pulled a gun, and told the four people in the store to lie down. One of these four people was BP employee Mohammad Tanveer, who would later view a photographic array and identify Webb as the robber.
 {¶ 9} Webb initially told a trainee to open the cash register, but the trainee did not know how to open it. Tanveer stood up and said that he could open the register. After Tanveer did so, Webb took the money, grabbed Tanveer by his neck, and demanded that Tanveer also open the safe. When Tanveer said that he did not have the key to the safe, Webb shot at Tanveer, narrowly missing him. Webb then left the store, and Tanveer immediately pressed a security button, which alerted the police.
 {¶ 10} Through the windows spanning the front of the store, Tanveer saw Webb get into the passenger side of a red car. Tanveer also saw the driver of the car, who he described as shirtless and extensively tattooed. Tanveer watched as the car drove onto the entrance ramp for I-71 North, and he wrote down its license plate number. At trial, Tanveer identified defendant as the driver of the car.
 {¶ 11} That same evening, Galen Gregg was at his home, which is located approximately 500 yards west of I-71 and one mile north of the Sunoco. Responding to a knock on his front door, Gregg found two men standing on his doorstep. The men explained that their car had broken down on the highway. Gregg looked toward I-71 and saw a red car sitting in the emergency lane of I-71 South. The men asked to use Gregg's telephone to call Columbus. One of the men was not wearing a shirt and had enough tattoos that Gregg was leery of inviting the men inside his house. However, Gregg offered the men the use of his cellular telephone. The tattooed man used Gregg's cellular telephone to call someone, but appeared not to get an answer.
 {¶ 12} While the three men were standing in front of Gregg's house, Gregg's granddaughter, Shelley Morris, drove by the house. Concerned by the presence of two strangers, Morris stopped and asked if Gregg needed anything. Gregg explained that the two men just needed to use the telephone. As Morris was leaving, one of the men asked Morris if she would drive them to the west side of Columbus. Morris agreed and, following their directions, dropped them off near Mount Carmel Hospital. At trial, Morris identified defendant as one of her passengers and Webb as the other. Morris described defendant as tall and shirtless and Webb as wearing a red t-shirt and khaki shorts.
 {¶ 13} Meanwhile, at approximately 7:30 p.m., deputies looking for the red get-away car discovered an abandoned red Ford Thunderbird in the emergency lane of I-71 South approximately one mile north of the Sunoco's exit. Transported to the scene, Tanveer identified the car as the same car used in the BP robbery. Deputies began searching the nearby area, and one found a discarded fishing hat.
 {¶ 14} Lieutenant Crabbe drove to the location of the car, and helped secure it. While waiting for a wrecker, Crabbe began chatting with Morris, who had stopped to view the commotion. Morris told Crabbe about the two strangers she and her grandfather had encountered earlier in the evening. Crabbe obtained Gregg's cellular telephone and extracted from it the telephone number the tattooed man had called. Crabbe called the telephone number and discovered that it belonged to Christopher Layne, a friend of defendant. Layne admitted that he had received a telephone call the evening of May 24 and that defendant was the caller.
 {¶ 15} Back at the BP gas station, Larry McDowell, a detective with the Franklin County Sheriff's Office, was processing the scene. McDowell collected a copper shell casing for a .380 Remington bullet and a spent bullet.
 {¶ 16} After a deputy obtained the VIN number of the red Thunderbird, McDowell and his partner determined that Sherry Glassnap owned the car. The two detectives drove to Glassnap's home, located near Mount Carmel Hospital. The detectives found Glassnap at her home and took her to the detective bureau to interview her. During this first interview, Glassnap claimed that she did not know where her car was located, but she subsequently admitted that she had allowed defendant, her fiancée, to borrow it to drive his friend, Webb, home.
 {¶ 17} In May 2004, Glassnap and defendant lived together in a house near Mount Carmel Hospital. Sometime during the night of May 23, defendant woke Glassnap and asked for money so that he could purchase a gun. Glassnap gave him the money and fell back asleep. The next morning, a silver-colored .380 gun was on the mantle in Glassnap's living room. Sometime later that day, Glassnap noticed that the gun was gone, and she never saw it again.
 {¶ 18} During the afternoon of May 24, Glassnap played with her children in her backyard as defendant's uncle repaired her car. After the car was fixed, defendant borrowed it to drive Webb home. Defendant and Webb returned to Glassnap's home at approximately 7:00 or 7:30 p.m. without Glassnap's car. Glassnap asked them where her car was, and defendant told her that it had broken down on "62 or 662," and that he and Webb had flagged down a passing car, robbed the couple in the car, and forced the woman to drive them home. Glassnap did not believe this story, and she told the pair that they needed to return her car.
 {¶ 19} Soon after this conversation, the detectives arrived and questioned Glassnap. After the detectives told Glassnap that her car was used in an armed robbery, Glassnap asked them if the gun involved was a .380. The detectives' affirmative answer confirmed Glassnap's suspicion that defendant had participated in the robbery. When Glassnap returned home, she asked defendant where he put the .380. Defendant told her that he had thrown the gun into a sewer and gotten rid of the ammunition he had for the gun. Glassnap subsequently found a box of ammunition in the bushes across the street from her house.
 {¶ 20} After Glassnap admitted to the detectives that defendant had borrowed her car, she identified Webb as the robber of the BP from a video of the robbery. Glassnap also identified the fishing hat found near her abandoned car as defendant's hat. Finally, Glassnap gave the detectives the box of ammunition she had found in the bushes. Detective McDowell testified that the ammunition was identical to the shell casing recovered from the BP scene.
 {¶ 21} After the close of the evidence, the trial court instructed the jury, at the state's request, that defendant was charged with complicity in committing each offense. The trial court directed the jury to find defendant guilty if the state proved that defendant aided or abetted another in the commission of each offense. The jury returned with guilty verdicts on all counts, except the count of having a weapon under a disability, which was tried to the trial court. The trial court later found defendant guilty of that count as well.
 {¶ 22} On November 5, 2004, the trial court conducted a sentencing hearing and sentenced defendant to: (1) a total of 11 years imprisonment for the counts arising out of the Sunoco robbery, and (2) a total of 13 years imprisonment for the counts arising out of the BP robbery. Further, the trial court ordered that defendant serve the sentences for the two cases consecutively. On November 9, 2004, the trial court reduced these sentences to judgment.
 {¶ 23} Defendant now appeals and assigns the following errors:
[1.] THE DEFENDANT WAS DENIED A RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT OVERRULED DEFENDANT'S MOTION TO SEVER THE TWO ROBBERY CASES.
[2.] THERE WAS INSUFFICIENT EVIDENCE FOR THE JURY TO CONVICT THE DEFENDANT OF THE SUNOCO ROBBERY THEREBY DENYING THE DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.
[3.] THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY. THIS DENIED APPELLANT A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARENTEED BY THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
 {¶ 24} By his first assignment of error, defendant argues that because the joinder of the two indictments for trial was prejudicial to him, the trial court erred in denying his motion to sever. We disagree.
 {¶ 25} Pursuant to Crim.R. 13, two indictments may be tried together if the offenses could have been joined in a single indictment. Under Crim.R. 8(A), a trial court may join offenses in the same indictment if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."
 {¶ 26} The law favors the joinder of multiple offenses in a single trial. State v. Brinkley, 105 Ohio St.3d 231,2005-Ohio-1507, at ¶ 28; State v. Coley, 93 Ohio St.3d 253,259, 2001-Ohio-1340; State v. Johnson, 88 Ohio St.3d 95, 109, 2000-Ohio-276; State v. Mills (1992), 62 Ohio St.3d 357, 361. Nevertheless, a trial court may grant a severance under Crim.R. 14 if a defendant affirmatively establishes that he would be prejudiced by a joinder. State v. Lott (1990),51 Ohio St.3d 160, 163. In order to succeed on a motion to sever, a defendant must furnish the trial court with sufficient information so that it can weigh the considerations favoring a joinder against the defendant's right to a fair trial. Id., quoting State v. Torres
(1981), 66 Ohio St.2d 340, syllabus. An appellate court will reverse a trial court's denial of a motion to sever only if the trial court has abused its discretion. Id.
 {¶ 27} The state can negate the defendant's claims of prejudice in two ways. Id. First, if the state shows that evidence of one offense would be admissible at a separate trial of the other offense as "other acts" evidence under Evid.R. 404(B), then joinder of the offenses in the same trial cannot prejudice the defendant. State v. LaMar, 95 Ohio St.3d 181,2002-Ohio-2128, at ¶ 50; Brinkley, at ¶ 30; Coley, at 259. Second, a joinder cannot result in prejudice if the evidence of the offenses joined at trial is simple and direct, so that a jury is capable of segregating the proof required for each offense.Johnson, at 109; Mills, at 362.
 {¶ 28} In the case at bar, the state argues that because Evid.R. 404(B) would have allowed it to introduce evidence of the BP robbery at a trial for the Sunoco robbery, it has negated defendant's claims of prejudice. Evid.R. 404(B) permits evidence of "other crimes, wrongs or acts * * * as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evidence of crimes may be introduced to prove identity if the defendant "`committed similar crimes within a period of time reasonably near to the offense on trial, and that a similar scheme, plan or system was utilized to commit both the offense at issue and the other crimes.'" Statev. Shedrick (1991), 61 Ohio St.3d 331, 337, quoting State v.Curry (1975), 43 Ohio St.2d 66, 73. See, also, State v. Lowe,69 Ohio St.3d 527, 1994-Ohio-345, syllabus ("To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question.").
 {¶ 29} Here, the Sunoco and BP robberies are temporally and geographically linked. Not only was the BP robbed approximately ten minutes after the robbery of the Sunoco, it was also located only ten miles and one highway exit away from the Sunoco. Further, both targets were gas stations located immediately adjacent to I-71, and both robberies followed a similar pattern — Webb entered the store, brandished a handgun, and demanded money from the cash register and safe. Given these circumstances, even if the two indictments were severed for trial, the state could have introduced evidence of the BP robbery at the Sunoco robbery under Evid.R. 404(B) to prove defendant's identity. Therefore, defendant was not prejudiced by the joinder of the two indictments for trial.
 {¶ 30} Defendant, however, argues that he was prejudiced because the evidence of his participation in the Sunoco robbery was weak, and the jury convicted him of the offenses related to that robbery on the combined proof offered upon all the offenses. Defendant's argument is unavailing. "`Where the evidence of each of the joined offenses would be admissible at separate trials, severance is not required because prejudice due to the cumulation of evidence or the inference of a criminal disposition is largely absent.'" State v. Sapp, 105 Ohio St.3d 104, 2004-Ohio-7008, at ¶ 70, quoting State v. Hamblin (1988), 37 Ohio St.3d 153, 159. Thus, because the evidence of the BP robbery would have been admissible at a separate trial of the Sunoco robbery, no prejudice stemmed from the jury's consideration of evidence relating to both robberies in reaching their verdicts.
 {¶ 31} Moreover, the evidence of both the Sunoco and BP robberies was simple and direct, and neither crime was so complex that the jury would have difficulty separating the proof required for each offense. Although the direct evidence of defendant's presence at the BP also served as circumstantial evidence of defendant's presence at the Sunoco, the evidence of each robbery was otherwise distinct. Therefore, no prejudice stemmed from juror confusion.
 {¶ 32} Accordingly, we conclude that the trial court did not abuse its discretion in joining the two indictments for trial, and thus, we overrule defendant's first assignment of error.
 {¶ 33} By defendant's second assignment of error, he argues that the evidence introduced at trial was insufficient to support his conviction for the offenses arising from the Sunoco robbery. We disagree.
 {¶ 34} When considering a challenge to the sufficiency of the evidence, an appellate court must determine whether the evidence is adequate to sustain a verdict. State v. Thompkins (1997),78 Ohio St.3d 380, 386-387. In doing so, an appellate court must:
[E]xamine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. * * *
State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. This test raises a question of law and does not allow the court to weigh the evidence. Thompkins, at 386;State v. Thomas (1982), 70 Ohio St.2d 79, 79-80. Rather, the sufficiency of the evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v.Virginia (1979), 443 U.S. 307, 319. Consequently, when reviewing the sufficiency of the evidence, an appellate court must accept the determination of the finder of fact with regard to the credibility of the witnesses. State v. Yarbrough,95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 79; State v. Worrell, Franklin App. No. 04AP-410, 2005-Ohio-1521, at ¶ 41 ("In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but, whether, if believed, the evidence against a defendant would support a conviction.").
 {¶ 35} In the case at bar, defendant was convicted of aggravated robbery, robbery, and kidnapping for his role in the Sunoco robbery. Defendant does not challenge that each of these crimes occurred; rather, he argues the evidence was insufficient to prove his complicity in the crimes.
 {¶ 36} Acting in complicity with a principal offender violates R.C. 2923.03(A), which states, in part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * (2) [a]id or abet another in committing the offense." The state may prove that a defendant aided or abetted another by both direct and circumstantial evidence, and a jury may infer participation from presence, companionship, and conduct before and after the offense was committed. State v. Brown, Franklin App. No. 03AP-130,2004-Ohio-2990, at ¶ 82.
 {¶ 37} Defendant posits that the only testimony tying him to the Sunoco robbery is Brown's testimony that the fishing hat that Webb wore during the robbery looked "kind of" like a fishing hat defendant owned. Defendant, however, ignores a plethora of circumstantial evidence the jury could rely upon in finding he aided and abetted Webb in committing the Sunoco robbery. First, the state presented evidence that defendant supplied and disposed of the gun used in the Sunoco robbery. Glassnap testified that the night before the robberies, defendant purchased a gun that matched the description of the gun used in the Sunoco robbery. Later, when questioned by Glassnap about his activities, defendant assured her that he had discarded the gun and its ammunition.
 {¶ 38} Second, the state presented evidence that defendant served as Webb's get-away driver. The evening of the robberies, defendant and Webb left defendant's Columbus home together in Glassnap's car. Soon afterward, Webb robbed the Orient Sunoco, which Webb only could have reached by automobile. Approximately ten minutes after the Sunoco robbery, Webb walked into the BP. As Webb traveled the ten miles between the Sunoco and BP in mere minutes, a reasonable person could infer that an automobile transported Webb to the BP immediately after he robbed the Sunoco. When Webb left the BP, he got into the passenger seat of Glassnap's car, which defendant drove away from the scene. Thus, the evidence demonstrates that Webb traveled to and from the Sunoco by automobile and, as defendant was driving Webb before the Sunoco robbery and after the BP robbery, the jury could infer that defendant also drove Webb to and from the Sunoco.
 {¶ 39} Construing the above evidence in favor of the state, a rational trier of fact could conclude that defendant aided and abetted Webb in committing the Sunoco robbery. Accordingly, we overrule defendant's second assignment of error.
 {¶ 40} By defendant's third assignment of error, he argues that his conviction for the offenses arising from the Sunoco robbery is against the manifest weight of the evidence. We disagree.
 {¶ 41} When presented with a challenge to the manifest weight of the evidence, an appellate court, after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, supra, at 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "`exceptional cases in which the evidence weighs heavily against conviction.'" Id.
 {¶ 42} In the case at bar, defendant asserts that the state failed to present any evidence to connect him to the Sunoco robbery. As we explained above, defendant is wrong. Although there is no direct evidence, the circumstantial evidence of defendant's participation in the Sunoco robbery is both credible and persuasive. Therefore, we conclude that this is not the exceptional case requiring reversal on manifest weight grounds.
 {¶ 43} Accordingly, we overrule defendant's third assignment of error.
 {¶ 44} For the foregoing reasons, we overrule all of defendant's assignments of error and affirm the judgments of the Franklin County Court of Common Pleas.
Judgments affirmed.
French and Deshler, JJ., concur.
Deshler, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Prior to trial, the trial court entered a nolle prosequi as to the attempted murder count.
[2] At trial, Brown viewed a still photograph taken from the videotape of the BP robbery. Brown testified that the fishing hat the man in the photograph was wearing looked "kind of" like the fishing hat worn by the man who robbed the Sunoco.