[Cite as *State v. Payne*, 2024-Ohio-4698.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                          :

    Plaintiff-Appellee/              :              No. 23AP-335
    Cross-Appellant,                              (C.P.C. No. 20CR-4756)
                                        :
v.
                                        :              (REGULAR CALENDAR)
Christopher L. Payne,
                                        :
    Defendant-Appellant/
    Cross-Appellee.                  :

---

D E C I S I O N

Rendered on September 26, 2024

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Darren M. Burgess*, for plaintiff-appellee/cross-appellant. **Argued:** *Darren M. Burgess.*

**On brief:** *Carpenter Lipps LLP*, *Kort Gatterdam*, and *Michael Rogers*, for defendant-appellant/cross-appellee. **Argued:** *Kort Gatterdam.*

---

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} This is an appeal and cross-appeal from the May 15, 2023 judgment of conviction entered by the Franklin County Court of Common Pleas after a jury found defendant-appellant/cross-appellee, Christopher L. Payne, guilty of crimes associated with a fatal drive-by shooting in August 2020 and the trial court found him guilty of firearms offenses following a bench trial. At sentencing on all counts, drive-by specifications, and firearms specifications, the trial court imposed an aggregate prison term of 40 years to life.

{¶ 2} On appeal, Mr. Payne attributes error to the trial court's unopposed admission of various types of evidence at his April 2023 jury trial, alleges prosecutorial misconduct, and further contends he was deprived of the effective assistance of counsel at that trial. He also takes issue with the trial court's decision to impose consecutive prison sentences for all three firearms specifications under R.C. 2941.145 and 2929.14(B)(1)(g).

{¶ 3} On cross-appeal, plaintiff-appellee/cross-appellant, the State of Ohio, asserts the definite prison term imposed by the trial court for the two attempted murder counts was contrary to law. Specifically, the state challenges the trial court's judgment declaring the indefinite sentencing provisions enacted through 2018 Am.Sub.S.B. No. 201 (the "Reagan Tokes Law") to be unconstitutional and argues the trial court committed reversible error when it instead imposed definite prison terms for two counts of attempted murder.

{¶ 4} Because Mr. Payne's six assignments of error are not well-taken and the Supreme Court of Ohio recently held the Reagan Tokes Law constitutional, we vacate Mr. Payne's prison sentence, remand the matter for resentencing consistent with the Reagan Tokes Law, and otherwise affirm the judgment below.

## I. PROCEDURAL BACKGROUND

{¶ 5} In October 2020, a Franklin County Grand Jury returned a 12-count indictment charging Mr. Payne with three counts of murder (Counts 1 through 3), one count of involuntary murder (Count 4), two counts of attempted murder (Counts 5 and 7), two counts of felonious assault (Counts 6 and 8), and one count of having weapons while under disability (Count 9) in connection with the August 23, 2020 drive-by shooting of M.B.—then 15 years old and 35 weeks pregnant—and the resulting death of her unborn son, A.L., while she was walking with Diarice Fitzgerald in a Linden neighborhood. In that same indictment, Mr. Payne was charged with one count of improper handling of firearms in a vehicle (Count 10), one count of carrying a concealed weapon (Count 11), and one count of having weapons while under disability (Count 13) after he was stopped by police on October 1, 2020 and arrested for the drive-by shooting. The 3-year firearm and 5-year drive-by shooting specifications were included with each of the murder, attempted murder, and felonious assault counts.

{¶ 6} Trial commenced on April 10, 2023. Mr. Payne waived his right to a jury on the two weapons under disability counts and the one carrying a concealed weapon count.

Thus, a jury was charged with determining Mr. Payne's guilt on the murder, involuntary manslaughter, attempted murder, and improper handling counts, while the trial court was tasked with rendering a bench verdict on the three firearms offenses.

{¶ 7} Following the presentation of evidence, the jury found Mr. Payne guilty of all nine counts and their corresponding specifications. After the remaining three counts were tried to the bench, the trial court found Mr. Payne guilty of two counts of having weapons while under disability and one count of carrying a concealed weapon.

{¶ 8} At the May 5, 2023 sentencing hearing, the trial court merged Counts 1, 3, and 4 with Count 2 (relating to the shooting death of A.L.); Count 6 with Count 5 (relating to M.B.); and Count 8 with Count 7 (relating to Mr. Fitzgerald). After merging the counts, the trial court sentenced Mr. Payne as follows:

> **Count 2** – Murder of A.L., in violation of R.C. 2903.02(B), an unclassified felony, with firearm and drive-by shooting specifications: Life with the possibility of parole after 15 years with a mandatory consecutive 3-year term as to the firearm specification under R.C. 2941.145(A) and a mandatory consecutive 5-year term as to the drive-by shooting specification under R.C. 2941.146(A), for a total prison term of 23 years to life.
>
> **Count 5** – Attempted murder of M.B., in violation of R.C. 2923.02, a felony of the first degree: 11 years with a mandatory consecutive 3-year term as to the firearm specification under R.C. 2941.145(A), for a total prison term of 14 years.
>
> **Count 7** – Attempted murder of Mr. Fitzgerald, in violation of R.C. 2923.02, a felony of the first degree: 10 years with a mandatory consecutive 3-year term as to the firearm specification, for a total prison term of 13 years.
>
> **Count 9** – Improper handling of a firearm in a motor vehicle, in violation of R.C. 2923.16, a felony of the fourth degree: 36 months.
>
> **Count 10** – Carrying a concealed weapon, in violation of R.C. 2923.12, a felony of the fourth degree: 18 months.
>
> **Count 11** – Having weapons while under disability, in violation of R.C. 2923.13, a felony of the third degree: 12 months.

> **Count 12** – Having weapons while under disability, in violation of R.C. 2923.13, a felony of the first degree: 36 months.

(*See* Tr. Vol. VII at 652-57; May 15, 2023 Jgmt. Entry.)

{¶ 9} The trial court then made statutory findings relating to the necessity of consecutive prison sentences and ordered Mr. Payne to serve the prison sentences imposed for Count 2 (murder of A.L.) and Count 5 (attempted murder of M.B.) consecutively to each other and to the mandatory 3-year prison term imposed as to the firearm specification charged with Count 7 (attempted murder of Mr. Fitzgerald), for an aggregate sentence of 40 years to life imprisonment.

{¶ 10} Mr. Payne's convictions and sentence were memorialized in the trial court's May 15, 2023 judgment entry.  Mr. Payne and the state both appeal from that judgment.

{¶ 11} Mr. Payne raises the following six assignments of error for our review:

> [I.] THE ADMISSION OF OTHER-ACTS TESTIMONY AND EVIDENCE VIOLATED EVIDENCE RULES 401, 403 AND 404 AND [MR. PAYNE'S] RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTION.
>
> [II.] THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED [MR. PAYNE] A FAIR TRIAL AND DUE PROCESS BY ADMITTING REPETITIVE, GRUESOME PHOTOGRAPHS OF THE DECEASED.
>
> [III.] PROSECUTORIAL MISCONDUCT DEPRIVED [MR. PAYNE] OF HIS RIGHTS TO DUE PROCESS AND TO TRIAL BY AN IMPARTIAL JURY CONTRARY TO THE FIFTH, SIXTH AND FOURTEENTH  AMENDMENTS TO THE UNITED STATES CONSTITUTION AND CORRESPONDING PROVISIONS OF THE OHIO CONSTITUTION.
>
> [IV.] THE PROSECUTION PRESENTED IMPROPER VICTIM-IMPACT EVIDENCE THAT INFLAMED THE JURY AND AFFECTED THE OUTCOME OF [MR. PAYNE'S] TRIAL CONTRARY TO [MR. PAYNE'S] STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL.
>
> [V.] [MR. PAYNE] WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF [HIS] RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED

STATES CONSTITUTION, AND SECTION[S] 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

[VI.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN IMPOSING CONSECUTIVE SENTENCES ON THREE FIREARM SPECIFICATIONS.

{¶ 12} On cross-appeal, the state asserts the following cross-assignment of error for our review:

THE TRIAL COURT ERRED AND IMPOSED A SENTENCE WHICH IS CONTRARY TO LAW WHEN IT REFUSED TO IMPOSE AN INDEFINITE PRISON TERM AS REQUIRED BY R.C. 2929.14 AND R.C. 2929.144.

## II. FACTUAL OVERVIEW

{¶ 13} The following facts were established at Mr. Payne's April 2023 jury trial.

{¶ 14} On August 23, 2020, Mr. Payne was driving a black Lincoln MKZ owned by his friend, Jalen Lee, with his then-girlfriend, Angel Hanks, riding in the front passenger seat. Mr. Payne and Ms. Hanks picked up Mr. Lee from Eastland Mall to acquire marijuana, at which time Mr. Lee began driving the car. With Mr. Payne directing Mr. Lee, the group drove to the Linden area, where, at some point, Mr. Payne was seated in the rear passenger seat of the car. At trial, Mr. Lee and Ms. Hanks both recalled driving around the same area for a bit.

{¶ 15} M.B. and Mr. Fitzgerald were walking in the neighborhood where the black Lincoln was circling. Mr. Fitzgerald told the jury he knew something was wrong "once the car circled a couple of times." (Tr. Vol. III at 275.) Mr. Lee testified about seeing M.B. and Mr. Fitzgerald, and recounted Mr. Payne telling him to "pull up on them" because Mr. Payne believed Mr. Fitzgerald—who admittedly was selling marijuana that day (*see* Tr. Vol. III at 274)—"has some weed." (Tr. Vol. III at 238.)

{¶ 16} As the black Lincoln approached Mr. Fitzgerald and M.B., a confrontation occurred. Mr. Lee described both Mr. Payne and Ms. Hanks "hollering" at Mr. Fitzgerald when they pulled up, followed by gunshots, which prompted him to duck down, "start driving, [and] try to pull off, because [he] didn't want to get hit by no bullet." (Tr. Vol. III at 247, 238. *See also* Tr. Vol. III at 279-83, 293.) According to Mr. Fitzgerald, shots were fired by the person in the rear passenger seat of the car. Ms. Hanks, on the other hand,

testified she was unable to tell where the gunshots were coming from (*see* Tr. Vol. IV at 384-85, 391), while Mr. Lee indicated it sounded like "they was shooting at each other" (Tr. Vol. III at 241).

{¶ 17} M.B. testified she did not get a good look at the shooter's face because the shots came "[o]ut of nowhere" and she dropped to the ground. (Tr. Vol. III at 196. *See also* Tr. Vol. III at 216-17.) However, she recounted seeing the shooter's closed eyes. Mr. Fitzgerald likewise testified the shooter's eyes were closed, and also recalled noticing the shooter's ears. Both M.B. and Mr. Fitzgerald described seeing the shooter holding the gun out of the car's window.

{¶ 18} After the black Lincoln drove off, M.B.—who was 35-weeks pregnant at the time—discovered she had been struck in the pelvis. Emergency responders were called to the scene and transported M.B. to the hospital. At the hospital, M.B. had an emergency caesarean delivery and learned her son, A.L., sustained a gunshot wound to the head. Later that same day, A.L. passed away from his injury.

{¶ 19} Immediately following the shooting, Mr. Lee drove Mr. Payne and Ms. Hanks to Mr. Payne's grandmother's house, located approximately 10 to 15 minutes away from the shooting location. Mr. Lee observed Mr. Payne put a gun in his pocket before walking into his grandmother's house. Although Ms. Hanks denied seeing Mr. Payne with a gun at that moment, she testified about seeing Mr. Payne with a gun later that day when the two were together in a hotel room. Ms. Hanks testified that, while at the hotel, Mr. Payne was "kind of worried about what possibly might have happened or whatever. Like, he didn't know what had happened that day, and he was just, like, worried or whatever. He was just scared." (Tr. Vol. IV at 378.) She also testified Mr. Payne was "very respectful" in giving her space while they were at the hotel that night. (*See* Tr. Vol. IV at 378.)

{¶ 20} Although both M.B. and Mr. Fitzgerald testified about seeing Mr. Payne around the neighborhood numerous times prior to the August 23, 2020 shooting, neither identified nor described him to first responders that day. Instead, Mr. Fitzgerald advised Columbus Police Department ("CPD") Detective Ronald Lemmon, Jr. "he would try and find out -- through the streets find out if he can figure out who was involved in the shooting." (Tr. Vol. IV at 425.)

{¶ 21} On August 28, 2020, Mr. Fitzgerald called Detective Lemmon with information he learned from "the streets" about the identity of the shooter. Specifically, he gave the police a "phone number that was believed to be involved that [was] registered to - - or that belonged to a gentleman, by the way, he referred to as CJ [Mr. Payne's nickname]." (Tr. Vol. IV at 426. *See also* Tr. Vol. III at 291-92.) Although Detective Lemmon acknowledged Mr. Fitzgerald telling him that he had paid someone for that number, no testimony or evidence was presented at trial establishing who provided Mr. Fitzgerald with that phone number or the circumstances surrounding that exchange.

{¶ 22} Assisting the police, Mr. Fitzgerald attempted a controlled call with that phone number on August 28, 2020. While admitting he did not speak with Mr. Payne before the shooting and could not recall that conversation because he "lost a lot of memory" after he was shot in another unrelated incident, Mr. Fitzgerald maintained the person he spoke with was Mr. Payne. (*See* Tr. Vol. III at 287.) Detective Lemmon testified the call was recorded, but conceded Mr. Payne did not admit to the shooting during that call.

{¶ 23} On August 30, 2020, M.B. and her mother contacted Detective Lemmon claiming M.B. had just seen the shooter drive by her home while she was sitting on the porch. Later that same day, M.B. met with Detective J. Shockey, the blind administrator for a photo array, and identified Mr. Payne as the shooter in that array. Notably, however, Detective Shockey's written summary of M.B.'s statement during that photo array identification suggested some uncertainty: "Pointing to Position # 3 – 'That's who I feel was the one.' 'That's the person I've seen around.' When asked if that's [the] person who shot from vehicle. 'No that's who I feel like shot, can't say that's him; that's who I've been picturing in my head.' " (Ex. 61.) In any event, M.B. identified Mr. Payne in the courtroom as the person who shot her.

{¶ 24} At some point, Mr. Fitzgerald was also shown a photo array but picked two different people, one of them being Mr. Payne. Nothing in the record before us indicates the identity of the other person Mr. Fitzgerald selected or whether that same person was included in the photo array shown to M.B. When explaining how he made his selection, Mr. Fitzgerald testified: "It was the only two people that came around me in the last 90 days that never been around me in life." (Tr. Vol. III at 294.) Mr. Fitzgerald also identified Mr. Payne as the shooter in the courtroom during trial.

{¶ 25} Subscriber information, phone records, and cell-site location information ("CSLI") later obtained by police provided further evidence of Mr. Payne's suspected involvement in the August 23, 2020 shooting. Subscriber information showed Mr. Payne as the named account holder associated with the cell phone number Mr. Fitzgerald provided to police. Using location data provided by Mr. Payne's cell phone service carrier, Detective James Howe of CPD's digital forensics unit created a report mapping Mr. Payne's approximate device location using CSLI[1] around the time of the shooting. Based on his analysis, Detective Howe—who was qualified without objection as an expert in digital forensics—opined that Mr. Payne's cell phone was in the general location of the shooting when it occurred.

{¶ 26} Law enforcement spoke with Mr. Payne at his grandmother's home on September 29, 2020. According to Detective Lemmon, Mr. Payne confirmed his phone number and maintained his cell phone was always with him. Mr. Payne denied being in the Linden area on August 23, 2020 and denied any involvement in the shooting. He maintained he was with the mother of his child, O.A., that entire weekend. However, when O.A. spoke with police on October 1, 2020, she denied being with Mr. Payne on the day of the shooting. And, during that interview, O.A. called Mr. Payne while police listened and recorded, at which time Mr. Payne asked her to tell them she was with him on August 23, 2020.

{¶ 27} On October 1, 2020, law enforcement stopped Mr. Payne while he was driving a vehicle to arrest him in connection with the shooting. During that arrest, law enforcement recovered a loaded semi-automatic handgun with an extended magazine clip. At trial, the state acknowledged the firearm recovered from Mr. Payne on October 1, 2020 was not the same firearm used in the August 2020 shooting. Indeed, during closing, the trial prosecutor

---

[1] By way of background, "[c]ell phones perform their wide and growing variety of functions by continuously connecting to a set of radio antennas called 'cell sites.' " *Carpenter v. United States*, 585 U.S. 296 (2018), syllabus. "Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI)." *Id.* at 300-01. "Wireless carriers collect and store this information for their own business purposes," but will provide the information to law enforcement when requested by search warrant. *See id.* at syllabus.

acknowledged law enforcement never recovered the gun used in connection with A.L.'s death.

{¶ 28} Around the time of Mr. Payne's arrest, detectives interviewed Mr. Lee and Mr. Hanks. Initially, both denied having any knowledge about the shooting. But, both later provided law enforcement with the information they generally testified to at trial about the incident. Mr. Payne did not testify at trial, as was his right.

{¶ 29} Because Mr. Payne attributes error to a wide range of trial matters, additional relevant facts are summarized within our analysis of each assignment of error.

## III. ANALYSIS OF MR. PAYNE'S SIX ASSIGNMENTS OF ERROR

{¶ 30} Mr. Payne's trial counsel filed no pre-trial motions and lodged no objections during trial or at the sentencing hearing. Mr. Payne's fifth assignment of error alleging ineffective assistance of counsel is based, in part, on matters raised in his other assignments of error. Accordingly, we first address Mr. Payne's first, second, and fourth assignments of error, which raise various evidentiary issues, and then turn to his fifth assignment of error, alleging various claims of deficient performance resulting, individually or in cumulation, in prejudice. We then analyze Mr. Payne's third assignment of error, which alleges prosecutorial misconduct in several respects, before resolving the state's cross-assignment of error.

### A. First, Second, and Fourth Assignments of Error: Unopposed Admission of Evidence

{¶ 31} Mr. Payne's first, second, and fourth assignments of error contend the trial court erred in admitting other-acts evidence, repetitive and gruesome photographs, and victim-impact evidence, respectively.

{¶ 32} Generally, the admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of discretion and material prejudice. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. An abuse of discretion implies the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 33} Mr. Payne concedes his trial counsel did not object to the evidence he now claims was improperly admitted and considered. The failure to object to the admission of evidence at trial waives all but plain error on appeal. *See* Crim.R. 30(A); *State v. Williams*,

10th Dist. No. 23AP-144, 2024-Ohio-311, ¶ 16, citing *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22-23.

{¶ 34} Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding an appellant's failure to timely raise those errors in the trial court. In such cases, the appellant bears the burden of demonstrating plain error on the record—i.e., the existence of a plain or obvious error that affected the outcome of the trial and resulted in a manifest miscarriage of justice. *See*, *e.g.*, *State v. West*, 168 Ohio St.3d 605, 2022-Ohio-1556, ¶ 3, citing *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 22. *See also State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To prevail on a claim that the trial court committed plain error, an appellant must demonstrate that an error occurred, that such error constitutes an obvious defect in the trial proceedings, and that the error affected the outcome of the trial. *See*, *e.g.*, *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, ¶ 23.

### 1. Other-Acts Evidence (First Assignment of Error)

{¶ 35} In his first assignment of error, Mr. Payne contends the trial court plainly erred in permitting witnesses to testify about his prior bad acts. We disagree.

{¶ 36} It is fundamental that "[a]n accused cannot be convicted of one crime by proving he committed other crimes or is a bad person." *State v. Jeffers*, 10th Dist. No. 06AP-358, 2007-Ohio-3213, ¶ 6, citing *State v. Jamison*, 49 Ohio St.3d 182, 183 (1990). *See also State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 20. Thus, "[t]he admissibility of other acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment." *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992). Pursuant to Evid.R. 404(B):

> Evidence of any other crime, wrong or act is not admissible to prove the person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> * * *

> This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

{¶ 37} In *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, the Supreme Court created a three-step analysis for reviewing the admissibility of a prior bad act:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R. 403.

*Id*. at ¶ 20. As to the first step—relevance—there must, of course, be substantial proof that the alleged other acts were committed by the defendant. *See Jeffers* at ¶ 8, citing *State v. Lowe*, 69 Ohio St.3d 527, 530 (1994).

{¶ 38} Mr. Payne's first argument is that the state's witnesses should not have been permitted to "accuse[] [Mr.] Payne multiple times of committing another homicide." (Appellant's Am. Brief at 17.) Significantly, that suggestion was first elicited by Mr. Payne's own attorney during cross-examination of Mr. Fitzgerald:

[DEFENSE]: Who is Miekharry Brice?

[FITZGERALD]: Who?

[DEFENSE]: Yes.

[FITZGERALD]: Miekharry?

[DEFENSE]: Yes. Who is that? Do you know that person by the name of –

[FITZGERALD]: You talking about the one that died?

[DEFENSE]: Yes.

[FITZGERALD]: Yeah, I know him.

[DEFENSE]: How did you know him?

[FITZGERALD]: My brother from [a] different mother.

[DEFENSE]: Did you ever tell anybody you thought [Mr. Payne] was responsible for that?

[FITZGERALD]: Actually, people was telling us he had something to do with it, like, part of a plan-type situation.

[DEFENSE]: And you believe that?

[FITZGERALD]: It could have been because the same people that did it was the same people he was around.

(Tr. Vol. III at 292.) This allegation again came up during the direct testimony of Detective Lemmon:

[PROSECUTOR]: Okay. And do you remember the nature of [the August 28, 2020 controlled call between Mr. Payne and Mr. Fitzgerald]?

[DETECTIVE LEMMON]: So they talked a lot about a -- there was a previous homicide that [Mr. Payne] was -- had heard that he had been involved in.

[PROSECUTOR]: So let me rephrase. Did [Mr. Payne] admit to this shooting?

[DETECTIVE LEMMON]: No.

[PROSECUTOR]: Okay. So essentially they just kind of went back and forth on a few things?

[DETECTIVE LEMMON]: Correct, but it was kind of a thing, like, where there was word on the street that Mr. Fitzgerald was looking for [Mr. Payne] and [Mr. Payne] got -- he was -- was dealing with it first.

[PROSECUTOR]: So there's some bad blood between the two?

[DETECTIVE LEMMON]: It appeared, yes.

(Tr. Vol. IV at 427.)   In closing, the trial prosecutor referenced Detective Lemmon's testimony—albeit, by misattributing it to Mr. Lee—suggesting Mr. Payne's motive for shooting Mr. Fitzgerald was "to get him before he gets me." (Tr. Vol. V at 535.)

{¶ 39} On review of the record, we cannot conclude the trial court committed plain error by permitting this testimony at trial.  The evidence was narrowly presented—first, by Mr. Payne's trial counsel, and then, without prompting, from Detective Lemmon's testimony—to provide some context for the dispute between Mr. Payne and Mr. Fitzgerald preceding the shooting.  Indeed, defense counsel raised the issue in an attempt to challenge Mr. Fitzgerald's credibility by suggesting bias, and Detective Lemmon's testimony was focused on summarizing the content of the controlled call.  Nothing in the record before us suggests the jury was ever told Mr. Payne, as a matter of fact, killed or was investigated for killing Brice.  Rather, the evidence suggested Mr. Fitzgerald had heard from people in the neighborhood that Mr. Payne was involved, and Mr. Fitzgerald suspected that was the reason Mr. Payne tried to kill him on August 23, 2020.  Mr. Payne thus fails to establish on appeal how this evidence demonstrates "evidence of other crimes, wrongs, or acts" committed by him, bringing it within the scope of Evid.R. 404(B).  It is further difficult to find plain error given that Mr. Payne's own trial counsel opened the door to the issue by questioning Mr. Fitzgerald about it on cross-examination.

{¶ 40} Mr. Payne's second argument takes issue with information presented by Mr. Lee (that Mr. Payne "always carr[ies] a gun") and Ms. Hanks (that Mr. Payne was not smoking marijuana on the day of the shooting because he was on probation). (Tr. Vol. III at 261; Tr. Vol. IV at 376, 382.)  In both instances, the testimony was brief and mentioned only in passing.  Neither Mr. Lee's reference to Mr. Payne "always carry[ing] a gun" nor Ms. Hanks's two references to Mr. Payne's probation status were detailed, and, once stated by Mr. Lee and Ms. Hanks, the prosecutor did not pursue any additional inquiry about the topics.  Thus, we cannot conclude these passing references—one being to the act of carrying a firearm, which is generally lawful in Ohio, and the other being to Mr. Payne's probation status for an undisclosed prior offense—affected the outcome of the trial so as to constitute plain error.

{¶ 41} Finally, Mr. Payne challenges the propriety of the state's presentation of evidence and testimony about the firearm recovered from his waistband on October 1,

2020, as it was not the firearm used in the August 23, 2020 shooting. But, this evidence was relevant to the improper handling of a firearm count tried to the jury.[2] For this reason, the evidence Mr. Payne takes issue with was not that of an "other bad act" but, rather, proof of his guilt for one of the charged offenses for which he was on trial.

{¶ 42} Even assuming any of the other-acts evidence with which Mr. Payne takes issue should have been excluded from trial, we cannot conclude, based on our extensive review of the record, that the outcome of his trial would have been any different because overwhelming evidence of his guilt existed. Unrefuted eyewitness testimony—including M.B. and Mr. Fitzgerald's clear and consistent testimony naming Mr. Payne as the shooter—and CSLI evidence all supported the jury's verdict finding Mr. Payne was the gunman responsible for the drive-by shooting.

{¶ 43} Accordingly, we overrule his first assignment of error.

### 2. Autopsy Photographs (Second Assignment of Error)

{¶ 44} In his second assignment of error, Mr. Payne contends the trial court plainly erred in admitting 11 photographs of the deceased, A.L., taken by the coroner because they were repetitive, gruesome, and unnecessary given that he stipulated to the cause and time of death. We disagree.

{¶ 45} Generally, autopsy photographs are admissible where they are probative of the defendant's intent and the manner and circumstances of the victim's death. *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, ¶ 92. Although autopsy photographs may not have been necessary to prove A.L.'s cause of death, the admission of the photographs was not necessarily overly prejudicial because they are "probative evidence of a purpose to cause death." *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 102.

{¶ 46} The Supreme Court has stated that gruesome photographs are those that depict "actual bodies or body parts," observing the "shock value" often associated with photographs of a corpse. *State v. DePew*, 38 Ohio St.3d 275, 281 (1988). Criticizing the admission of excessive autopsy photographs in a murder trial, the court has recognized that

---

[2] Though Mr. Payne believes the improper handling offense, along with the two other offenses arising from the October 1, 2020 traffic stop, should have been severed for purposes of trial from the counts related to the August 23, 2020 shooting, the fact remains that severance was not requested in the court below. Indeed, Mr. Payne attributes error to that failure in his fifth assignment of error alleging ineffective assistance of counsel.

gruesome photographs expose jurors to horrific images and might serve no useful purpose except to inflame the passions of the jurors. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶ 257. Thus, to be admissible, "the probative value of each photograph must outweigh the danger of prejudice to the defendant and, additionally, not be repetitive or cumulative in nature." *State v. Morales*, 32 Ohio St.3d 252, 258 (1987). *See also State v. Thompson*, 33 Ohio St.3d 1, 9 (1987). The admission of gruesome photographs will be left to the trial court's sound discretion. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, ¶ 69; *State v. Slagle*, 65 Ohio St.3d 597, 601-02 (1992).

{¶ 47} In this case, 11 autopsy photographs of A.L. were admitted into evidence. These photographs depicted a deceased infant corpse with a gunshot wound to the head wearing a diaper and connected to numerous medical support tubes. Again, despite the parties' stipulation to the cause of A.L.'s death and the nature of his injuries, Mr. Payne's trial counsel failed to object to the admission of these photographs. In fact, the authentication and admissibility of those 11 photographs were stipulated to by the parties. (*See* Stip. No. 1 at ¶ 2. *See* Tr. Vol. I at 19-20.)

{¶ 48} During voir dire, the trial prosecutor himself recognized the disturbing nature of these photographs: "[W]hile they are certainly not excessively graphic, they are graphic, and they are disturbing because it's a dead infant." (Tr. Vol. I at 101.) On review, we agree. At the same time, we note the state's presentation of these photographs was limited during trial. M.B. was shown one of those photographs (Ex. 1) to identify A.L. (Tr. Vol. III at 206.) Although the 11 autopsy photographs were referenced in Stipulation No. 1 and admitted into evidence, they were not shown or used as exhibits during the testimony of any other witnesses besides M.B. *See State v. Tatum*, 10th Dist. No. 04AP-561, 2005-Ohio-1527, ¶ 16-17 (finding no abuse of discretion in the trial court's admission of two photographs depicting a deceased baby where they were presented in a straightforward way, did not belabor the extent of the baby's wounds, and prosecution did not call special attention to the photographs).

{¶ 49} Obviously, any photograph of a deceased infant could impact almost anyone, including members of a jury. Indeed, all evidence concerning the loss of a child is likely to be emotional. Before they were formally admitted as evidence in Mr. Payne's trial, the trial court reviewed these 11 photographs, at the state's request, and found that "[t]he photos

showing the wounds are specific but not unduly prejudicial relative to their probative value, and so, on that basis and hearing no objection from the defense in any event, the Court finds that those are appropriate exhibits to go to the jury." (Tr. Vol. IV at 481-82.) We note the trial court did not expressly state any finding on whether the 11 photographs of A.L. were needlessly repetitive or cumulative in nature.[3]   However, because Mr. Payne's trial counsel not only failed to object to the admission of these 11 photographs but, in fact, **stipulated** to their authenticity and admissibility at trial, our ability to review the adequacy of the trial court's pre-admission analysis of these photographs is limited.

{¶ 50}   Indeed, in light of the stipulation, the more pertinent question is whether the trial court's alleged error in admitting these 11 photographs, plain or otherwise, was invited. On review, we conclude that it was.  The invited error doctrine provides that "a party will not be permitted to take advantage of an error that he himself invited or induced the trial court to make." *State ex rel. The V Cos. v. Marshall*, 81 Ohio St.3d 467, 471 (1998).  Invited error occurs when defense counsel " 'was actively responsible' for the trial court's error" or "when a party has asked the court to take some action later claimed to be erroneous." *State v. Campbell*, 90 Ohio St.3d 320, 324 (2000), quoting *State v. Kollar*, 93 Ohio St. 89, 91 (1915).  And, more narrowly, we have held that invited error extends to stipulations.  *State v. McClendon*, 10th Dist. No. 11AP-354, 2011-Ohio-6235, ¶ 37.

{¶ 51}   In any event, even if we found the 11 photographs of A.L. were repetitive and gruesome and thus should have been excluded—in full or in part—from trial, Mr. Payne cannot demonstrate the outcome of his trial would have been different had they been excluded.  M.B. and Mr. Fitzgerald both testified, without equivocation, that Mr. Payne was responsible for the August 23, 2020 drive-by shooting that resulted in A.L.'s death.  Mr. Lee and Ms. Hanks both testified about Mr. Payne directing Mr. Lee where to drive on August 23, 2020, and Mr. Lee stated Mr. Payne instructed him to "pull up" on M.B. and Mr. Fitzgerald moments before the shooting occurred.  (Tr. Vol. III at 238.)  This testimony, in conjunction with the CSLI evidence, undermined Mr. Payne's September 2020 statement to police that "he was not in the Linden area" on the day of the shooting but was instead with O.A., who denied as much at trial. (*See* Tr. Vol. IV at 410, 432-33.)  And because Mr.

---

[3] And, given the absence of any dispute about the cause and manner of A.L.'s death, it is difficult to see how these 11 photographs of a deceased infant were not needlessly repetitive.

Payne did not testify—as was his right—or present any evidence otherwise refuting his presence at the scene, the state's overwhelming evidence of his guilt remained largely unrefuted at trial.

{¶ 52} For these reasons, we overrule Mr. Payne's second assignment of error.

### 3. Victim-Impact Evidence (Fourth Assignment of Error)

{¶ 53} In his fourth assignment of error, Mr. Payne contends the trial court plainly erred in admitting victim-impact evidence concerning the death of A.L. through the testimony of M.B. and Mr. Fitzgerald. For the following reasons, we find no plain error in the trial court's admission of the challenged evidence.

{¶ 54} Victim-impact testimony includes evidence relating to " 'the personal characteristics of the victim and the emotional impact of the crimes on the victim's family.' " *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 259, quoting *Payne v. Tennessee*, 501 U.S. 808, 817 (1991).

{¶ 55} Admission of victim-impact evidence is improper if it is "overly emotional." *See State v. Reynolds*, 80 Ohio St.3d 670, 679 (1998); Evid.R. 403(A). "Testimony is overly emotional when it is likely to inflame the passions of the jurors and elicit a purely emotional response that would inhibit the jurors from making an objective and rational determination regarding the defendant's guilt and/or the appropriate punishment." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 123. Factors relevant in making that determination include: (1) "the length of the victim-impact testimony," (2) "whether witnesses, jurors, and audience members showed physical signs of emotion during the testimony," (3) "the detail and depth of the victim-impact testimony with regard to the murder victim," and (4) "whether the victim-impact witness used emotionally charged language." *Id*. at ¶ 126. However, this is not an exhaustive list. *See id*.

{¶ 56} Additionally, victim-impact testimony can be irrelevant, and thus inadmissible, if it merely describes the personal characteristics and qualities of the victim without any relevance to the circumstances of the crime. *See* Evid.R. 402; *State v. Nicholson*, ____ Ohio St.3d ____, 2024-Ohio-604, ¶ 452-54 (Kennedy, C.J., concurring), citing *McKelton* at ¶ 259.

{¶ 57} Here, Mr. Payne takes issue with M.B.'s testimony about the name of her son, how he was on life support when he was delivered, that she held her son for some period

before he died, and that she engaged in counseling after this incident. He also challenges Mr. Fitzgerald's testimony noting A.L. "didn't have a chance to grow up and really experience life" and indicating he was testifying "[f]or the baby." (Tr. Vol. III at 290.)

{¶ 58} Of course, the loss of any life—but particularly a newborn's—is likely to impact almost anyone, including the members of a jury. However, "[e]ven if such testimony was of questionable relevance, [the challenged] testimony was brief and 'not overly emotional or directed to the penalty to be imposed.' " *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 134, quoting *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 237. True, M.B.'s testimony that she received counseling after the incident and Mr. Fitzgerald's indication he was testifying to get justice for A.L., along with his observation that A.L. would never have the opportunity to experience life, were of questionable relevance. However, these small portions of M.B. and Mr. Fitzgerald's testimony were not overly emotional and did not concern the sentence that should be imposed. *See*, *e.g.*, *Graham* at ¶ 126-30. And while M.B.'s testimony about naming her son and her last moments with him may have been overly emotional—particularly because she was shown one of the coroner's photographs of A.L. during that account—at least a portion of that testimony was related to the facts attendant to the offense, specifically, the circumstances surrounding A.L.'s death.

{¶ 59} But, even if we agreed the victim-impact testimony identified by Mr. Payne in this assignment of error had no probative value and should have been excluded from trial, Mr. Payne cannot demonstrate the outcome of his trial would have been different. Significantly, the victim-impact testimony at issue was brief and did not pertain to the penalty to be imposed. And, again, overwhelming evidence of Mr. Payne's guilt was presented at trial. Mr. Lee and Ms. Hanks both testified that it was Mr. Payne who directed Mr. Lee where to drive on August 23, 2020 (*see* Tr. Vol. III at 238-39; Tr. Vol. IV at 383), and Mr. Lee stated Mr. Payne instructed him to "pull up" on M.B. and Mr. Fitzgerald moments before the shooting (*see* Tr. Vol. III at 238). M.B. and Mr. Fitzgerald both gave clear and consistent accounts that Mr. Payne was responsible for the shooting. And, the testimony of Mr. Lee and Ms. Hanks, along with CSLI information obtained from Mr. Payne's cell phone, further supported their unrefuted testimony that Mr. Payne was present at the scene when the shooting occurred.

{¶ 60} For these reasons, we overrule Mr. Payne's fourth assignment of error.

## B. Fifth Assignment of Error: Ineffective Assistance of Counsel

{¶ 61} In his fifth assignment of error, Mr. Payne argues he received ineffective assistance of counsel. However, because he fails to establish he was prejudiced by trial counsel's deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984), we must overrule this assignment of error, for the reasons that follow.

### 1. Controlling Law and Standard of Review

{¶ 62} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or objectively unreasonable, as determined by " 'prevailing professional norms,' " and (2) that counsel's deficient performance prejudiced the defendant. *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, ¶ 77, quoting *Strickland* at 694.

{¶ 63} To show that trial counsel's performance was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989).

{¶ 64} Prejudice results when " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Bradley* at 142, quoting *Strickland* at 694. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.*, quoting *Strickland* at 694.

{¶ 65} When analyzing an ineffective assistance of counsel claim, an appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland* at 697. *See also State v. Wade*, 10th Dist. No. 20AP-456, 2021-Ohio-4090, ¶ 19. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." *Strickland* at 697.

## 2. Analysis

{¶ 66} Mr. Payne asserts his trial counsel was ineffective in several ways: (1) failing to move to sever the nine counts related to the August 23, 2020 shooting from the three counts related to the firearm seized on October 1, 2020; (2) failing to move to dismiss the gun charges pursuant to *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022); (3) failing to sufficiently question prospective jurors during voir dire; (4) failing to make any objections during trial, to Mr. Payne's detriment, as more fully explained below; and (5) failing to object to the imposition of the third firearm specification. Additionally, Mr. Payne asserts the cumulative effect of counsel's alleged errors, when combined with other errors, denied him due process and a fair trial.

{¶ 67} As to the merits of each ineffective assistance claim, the state argues Mr. Payne fails to rebut the presumption that his trial counsel provided him with adequate representation. The state also contends Mr. Payne has failed to demonstrate how he was prejudiced by any of the alleged errors individually or cumulatively.

### a. Failure to file pretrial motion to sever

{¶ 68} Mr. Payne first contends his attorney was ineffective for failing to file a pre-trial motion to sever for purposes of trial the counts stemming from the August 2020 shooting incident from the three firearms-related offenses charged when he was stopped in a car and arrested in October 2020.

{¶ 69} Crim.R. 8(A) governs the joinder of offenses in a single indictment. Under that rule, two or more offenses may be charged together if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A).

{¶ 70} The law favors joining multiple offenses in a single trial if the requirements of Crim.R. 8(A) are satisfied. *State v. Torres*, 66 Ohio St.2d 340, 343 (1981). Under Crim.R. 14, however, the trial court may order separate trials of counts if it appears that the defendant would be prejudiced by the joinder of offenses. The defendant bears the burden of proving prejudice. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 29.

{¶ 71} The state can refute a defendant's prejudice claim by showing either: (1) the evidence of each crime is simple and direct (the "joinder" test), or (2) evidence of the other

crimes would be admissible even if the counts were severed (the "other acts" test). *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). When the evidence is "simple and direct," an accused is not prejudiced by joinder regardless of the inadmissibility of evidence of the crimes as other acts under Evid.R. 404(B). *Id*. And, if the state can meet the requirements of the "joinder test," it need not meet the requirements of the more exacting "other acts" test. *See, e.g., State v. Franklin*, 62 Ohio St.3d 118, 122 (1991).

**{¶ 72}** Evidence is "simple and direct" if the jury is capable of segregating the proof required for each offense. *State v. Cameron*, 10th Dist. No. 09AP-56, 2009-Ohio-6479, ¶ 40, citing *State v. Mills*, 62 Ohio St.3d 357, 362 (1992). "The rule seeks to prevent juries from combining the evidence to convict the defendant, instead of carefully considering the proof offered for each separate offense." *Id*.

**{¶ 73}** In this case, even assuming Mr. Payne could establish prejudicial joinder, the evidence of each offense presented is simple and direct and not confusing or difficult to separate. Though Mr. Payne states in his brief that the evidence is not simple and direct, his argument focuses not on the evidence itself, but rather, the state's presentation of the same. On review of the record before us, we find the trial prosecutor's oral representations and the evidence presented made clear to the jury that the gun recovered from Mr. Payne in October 2020 was not the gun used in the August 2020 drive-by shooting. For this reason, we conclude the improper handling of a firearm in a vehicle offense was separate from the murder, attempted murder, and felonious assault counts related to the August 2020 shooting. We further find the evidence supporting these counts was not so complex that the jury would have difficulty separating the proof required for each offense. *See State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, ¶ 39 (10th Dist.), citing *State v. Tipton*, 10th Dist. No. 04AP-1314, 2006-Ohio-2066, ¶ 31.

**{¶ 74}** After careful consideration, we are unable to conclude that defense counsel rendered ineffective assistance of counsel by failing to file a motion to sever. While we are inclined to agree that Mr. Payne's trial counsel could have sought to limit the scope of the state's presentation of evidence supporting the improper handling count, such belief has no bearing on the issue of whether joinder of the offenses would have been appropriate in this case. Because we find joinder of offenses was appropriate in this case—notwithstanding the state's acknowledgement during oral argument that the trial court's typical practice

would be to grant severance of unrelated firearms counts—we reject Mr. Payne's argument that he was prejudiced by his counsel's failure to request a severance.

### b. Failure to move to dismiss gun charges under *Bruen*

{¶ 75} Mr. Payne next alleges his attorney was ineffective for failing to move to dismiss counts related to his possession of a firearm in light of the United States Supreme Court's decision in *Bruen*, 597 U.S. at 9.

{¶ 76} In *Bruen*, the Supreme Court held that the Second Amendment protects the right of an "ordinary law-abiding citizen" to carry a firearm for self-defense. *Id. See also Dist. of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The *Bruen* decision sets out the test courts must apply when analyzing any Second Amendment challenge to the constitutionality of a statute or regulation:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen* at 24.

{¶ 77} Applying the first step of its analysis, the *Bruen* court explained the Second Amendment works to " 'guarantee the individual right to possess and carry weapons in case of confrontation.' " *Id.* at 32, quoting *Heller* at 592. The court noted that "*Heller* further confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry * * * upon the person or in the clothing or in a pocket, for the purpose * * * of being armed and ready for offensive or defensive action in a case of conflict with another person.' " *Id.*, quoting *Heller* at 584. The *Heller* court observed that there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller* at 581. Years later, the *Bruen* court held that the Second Amendment's plain text covered the regulated conduct in that case, which was "carrying handguns publicly for self-defense." *Bruen* at 32.

{¶ 78} If a defendant meets the burden of showing that the conduct at issue is covered by the Second Amendment's plain text, the burden shifts to the state to

"affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[4] *Bruen* at 19. Given that modern regulations "were unimaginable at the founding," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* at 28. Thus, courts must consider whether the challenged regulation and the historical analogues provided by the state are "relevantly similar." *Id.* at 29. While not purporting to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," the *Bruen* court provided two metrics for lower courts to consider: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* In applying *Bruen*'s second step, courts should employ a "historical inquiry," relying on " 'various evidentiary principles and default rules' to resolve uncertainties" "based on the historical record compiled by the parties." *Bruen* at 25, fn. 6. The burden falls solely on the state to create this record. *See id.* at 60.

{¶ 79} On appeal, Mr. Payne contends the *Bruen* decision "called into question the constitutionality" of Ohio's gun regulations and argues his trial counsel was deficient for failing to challenge the constitutionality of Ohio's weapon under disability and concealed carry statutes in the trial court. (Appellant's Brief at 45.) Mr. Payne asserts that such failure was prejudicial because it prevents him from presenting such arguments on appeal.

{¶ 80} It is true that, generally, the failure to raise at the trial court level the issue of constitutionality of a statute or its application constitutes a waiver of such issue on appeal. *See State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus. But, application of the *Awan* waiver doctrine is discretionary. *See In re M.D.*, 38 Ohio St.3d 149 (1988), syllabus ("Even where waiver is clear, this court reserves the right to consider constitutional challenges to the application of statutes in specific cases of plain error or where the rights and interests involved may warrant it."). *See also* Crim.R. 52(B) (providing that "[p]lain errors or defects

---

[4] We note that, after Mr. Payne commenced this appeal, the United States Supreme Court issued a decision upholding a federal statute forbidding possession of a firearm by an individual subject to a domestic violence restraining order as long as the protection order is based on "a finding that [the person] poses 'a credible threat to the physical safety' of a protected person." *United States v. Rahimi*, ___U.S.___, 144 S.Ct. 1889, 1898 (2024), quoting 18 U.S.C. 922(g)(8)(C)(i). In *Rahimi*, the court noted that "some courts have misunderstood the methodology of our recent Second Amendment cases," and clarified—and slightly narrowed—how the history-and-tradition test of *Bruen* should be applied. *See id.* at 1897-1903. Specifically, the court observed that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98, citing *Heller*, 554 U.S. at 582.

affecting substantial rights may be noticed although they were not brought to the attention of the court"); *State v. Zuern*, 32 Ohio St.3d 56, 63 (1987).

{¶ 81} On appeal, Mr. Payne does not challenge the constitutionality of Ohio's carrying concealed weapon or weapons under disability statutes, pursuant to *Bruen*, under the plain error standard. As such, this court does not—and has not previously had—the occasion to rule on the matter.

{¶ 82} In any event, in the absence of any binding legal authority declaring these statutes unconstitutional, we cannot conclude that Mr. Payne's trial counsel rendered deficient performance in this regard or that Mr. Payne was prejudiced by such error. *Compare State v. Storms*, 1st Dist. No. C-230593, 2024-Ohio-1954 (describing the applicable standard for analyzing a *Bruen* challenge to the constitutionality of a firearm statute and holding the trial court erred in failing to analyze whether the state affirmatively proved Ohio's carrying concealed weapon statute, R.C. 2923.12, is part of the historical tradition that delineates the outer bounds of the right to keep and bear arms); *State v. Jenkins*, 5th Dist. No. 2023 CA 00058, 2024-Ohio-1094, ¶ 23 (observing the absence of any post-*Bruen* case law in Ohio on the constitutionality of any of the provisions of Ohio's weapons under disability statute, R.C. 2923.13, while noting the "overwhelming weight of federal authority" upholding federal laws prohibiting the possession of weapons by felons as constitutional under *Bruen*). Moreover, in light of the *Rahimi* court's recent clarification of the second step of the test announced in *Bruen*, the government only needs to show the challenged regulation has a well-established and representative historical analogue, not a "historical twin." *See Rahimi*, 144 S.Ct. at 1903.

{¶ 83} For these reasons Mr. Payne's contention that he was prejudiced by his counsel's failure to challenge the constitutionality of these statutes under *Bruen* is not well-taken.

### c. Voir dire

{¶ 84} Mr. Payne also contends his trial counsel was ineffective for failing to thoroughly question prospective jurors during voir dire. Specifically, he takes issue with the overall brevity of his trial counsel's questioning and failure to ask prospective jurors about some of the matters that would be at issue during trial.

{¶ 85} "The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans*, 63 Ohio St.3d 231, 247 (1992). For these reasons, courts have recognized that trial "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539 (2001). *See also State v. Bradley*, 42 Ohio St.3d at 143. We are thus not inclined to "second-guess trial strategy decisions" or impose "hindsight views about how [trial] counsel might have voir dired the jury differently." *State v. Mason*, 82 Ohio St.3d 144, 157 (1998).

{¶ 86} Though Mr. Payne states in his brief some of the types of questions he believes trial counsel should have asked, he fails to specifically explain why he believes such failure was deficient or how, had these questions been asked, the outcome of trial would have been different. He does not take issue with any particular juror who served on the jury or otherwise claim the information contained in any particular juror's questionnaire specifically warranted further inquiry. *Compare State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, ¶ 31-32 (holding counsel's voir dire of juror was objectively unreasonable under *Strickland* when juror's questionnaire answers indicated racial bias warranting further specific inquiry). Notably, the three jurors who expressed concern about seeing photographs of a deceased infant during the state's voir dire were ultimately excused—two for cause and the other by the defense's first peremptory challenge.

{¶ 87} Upon review of the entire record, and in the absence of the juror questionnaires being made part of the record before us in this case, we cannot say defense counsel's minimal questioning of prospective jurors was deficient under *Strickland*. Moreover, Mr. Payne has not established that he suffered prejudice because of his trial counsel's failure to engage prospective jurors about general topics relevant to the issues at trial. Having found Mr. Payne has failed to satisfy either of the *Strickland* prongs, we reject his claim that his counsel rendered ineffective assistance during voir dire.

### d. Failure to raise any objections during trial

{¶ 88} Mr. Payne next argues his attorney was ineffective for failing to make any objections during his four-day trial. He contends there were numerous issues that should have been objected to, and presents arguments specifically related to the state's presentation of the following: (1) other-acts evidence; (2) improper victim-impact evidence;

(3) gruesome and repetitive photographs; and (4) portions of Detective Lemmon's testimony.

{¶ 89} Assuming arguendo that this challenged evidence was inadmissible, however, the "failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway*, 38 Ohio St.3d 239, 244 (1989). *See also State v. Pawlak*, 8th Dist. No. 99555, 2014-Ohio-2175, ¶ 81-83; *State v. Taylor*, 10th Dist. No. 12AP-870, 2013-Ohio-3699, ¶ 33-35. As the Supreme Court has explained:

> "[E]xperienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006).

{¶ 90} As already outlined in our analysis of his first, second, and fourth assignments of error, Mr. Payne fails to establish on appeal that he was prejudiced by the admission of other-acts evidence, victim-impact testimony, and 11 gruesome photographs[5] that he also challenges under the ineffective assistance of counsel framework.

{¶ 91} We are likewise unable to conclude that defense counsel rendered ineffective assistance of counsel by failing to object to Detective Lemmon's improper or otherwise objectionable testimony. As to this claim, Mr. Payne takes issue with Detective Lemmon's testimony: (1) summarizing "what just about everyone else told him during his investigation, even where he did not have firsthand knowledge;" (2) describing "what the gas station video revealed despite the fact that the video spoke for itself;" (3) repeating hearsay from Mr. Fitzgerald's controlled call with Mr. Payne concerning the death of Brice, as set forth above; (4) generally repeating hearsay from Ms. Hanks and O.A.; (5) misstating

---

[5] Notably, while Mr. Payne takes issue with trial counsel's failure to **object** to the admission of the 11 photographs of A.L., he does not include trial counsel's **stipulation** to the admissibility of the 11 photographs as part of his ineffective assistance of counsel claim.

the conclusions of the CSLI expert, Detective Howe, about the location of Mr. Payne's phone at the time of the shooting; and (6) opining that the bullet holes in the vehicle's doors and on the vehicle came from inside the car despite not being qualified as a ballistics expert and in the absence of testimony from a ballistics expert at trial. (Appellant's Brief at 50-51.)

{¶ 92} However, even if all of these challenged matters should have been objected to and excluded from Detective Lemmon's testimony at trial, we find nothing in this record to support Mr. Payne's position that he was prejudiced by this testimony. The jury watched the gas station video and heard from Mr. Fitzgerald, Ms. Hanks, O.A., and Detective Howe at trial. Mr. Payne's trial counsel questioned these witnesses about relevant matters before Detective Lemmon testified, including Mr. Fitzgerald's belief of Mr. Payne's potential involvement in the shooting death of Brice. Defense counsel also corrected Detective Lemmon's misstatements about Detective Howe's CSLI conclusions during cross-examination of Detective Lemmon (*see* Tr. Vol. IV at 447) and broadly confirmed in his cross-examination of Detective Howe that his expert testimony is limited to the general location of the phone (*see* Tr. Vol. III at 319-20). And, regarding Detective Lemmon's testimony about the bullet holes observed in photographs of Mr. Lee's vehicle—which were shown to the jury and admitted as exhibits during trial—there was no dispute in the evidence presented that M.B. was struck in the abdomen (and, by virtue of her pregnancy, A.L. in the head) by a bullet that was fired from a gun by someone inside the black Lincoln, and Mr. Payne did not claim he acted in self-defense.

{¶ 93} Although Mr. Payne broadly takes issue with Detective Lemmon's ability "to testify what just about everyone else told him during his investigation, even where he did not have firsthand knowledge," he does not explain how he was prejudiced by trial counsel's failure to object to that testimony. (*See* Appellant's Brief at 50, citing Tr. Vol. IV at 415-54.) Thus, he fails to satisfy the prejudice prong of *Strickland* with respect to this claim.

### e. Failure to object to imposition of third firearm specification prison term at sentencing

{¶ 94} Mr. Payne also contends his trial counsel was ineffective in failing to object to the trial court's imposition of the third firearm specification prison term at sentencing pursuant to R.C. 2929.14(B)(1)(b) and (g).

{¶ 95} R.C. 2929.14(B)(1) pertains to sentencing for firearms specifications. Under R.C. 2929.14(B)(1)(b), a sentencing court is barred from imposing more than one firearm-specification prison term on an offender, as contemplated in R.C. 2929.14(B)(1)(a), for felonies committed as part of the same act or transaction ***except*** as otherwise provided by R.C. 2929.14(B)(1)(g). That provision states:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, ***in its discretion***, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

(Emphasis added.)

{¶ 96} As discussed more in our analysis of Mr. Payne's sixth assignment of error below, R.C. 2929.14(B)(1)(g) clearly provides the trial court with discretion in deciding whether to impose prison sentences for more than two firearm specification convictions even when the underlying felonies linked with those specifications were committed as part of the same act or transaction. Thus, even assuming that Mr. Payne's trial counsel was deficient in failing to petition the trial court to exercise its discretion and impose just two of the firearm-specification prison terms under R.C. 2929.14(B)(1)(g), Mr. Payne fails to establish on appeal a reasonable probability that the outcome of his sentencing—meaning, the trial court's exercise of its discretion—would have been different had such argument been presented. Consequently, we must conclude that Mr. Payne has failed to demonstrate he received ineffective assistance of counsel in this respect.

### f. Cumulative error

{¶ 97} Finally, Mr. Payne argues his counsel was ineffective based on the cumulative effect of his errors during trial. "Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous errors does not individually constitute cause for reversal." *Graham*, 2020-

Ohio-6700 at ¶ 169. *See also State v. C.D.S.*, 10th Dist. No. 20AP-355, 2021-Ohio-4492, ¶ 112. As applied to a claim for ineffective assistance of counsel, "[e]ach assertion of ineffective assistance of counsel going to cumulative error depends on the merits of each individual claim; when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together." *Graham* at ¶ 170, citing *State v. Hill*, 75 Ohio St.3d 195 (1996).

{¶ 98} Even assuming we found Mr. Payne's ineffective assistance claims, when considered in the aggregate, amount to deficient performance of his trial counsel, we nonetheless find he cannot demonstrate the prejudice necessary under *Strickland*. This is because the state produced overwhelming evidence of his guilt at trial.

{¶ 99} Mr. Lee and Ms. Hanks both testified about Mr. Payne directing Mr. Lee where to drive on August 23, 2020 (*see* Tr. Vol. III at 238-39; Tr. Vol. IV at 383) and Mr. Lee stated Mr. Payne instructed him to "pull up" on M.B. and Mr. Fitzgerald moments before the shooting occurred (Tr. Vol. III at 238). Mr. Lee and Ms. Hanks also testified Mr. Payne was in the rear passenger seat of Mr. Lee's vehicle when the drive-by shooting occurred, and CSLI evidence presented through Detective Howe's expert testimony supported their account. And, O.A. directly refuted Mr. Payne's September 2020 statement to law enforcement claiming he was with her at the time of the August 2020 shooting. (*See* Tr. Vol. IV at 410, 432-33.) Mr. Payne did not present any evidence disputing his presence when the shooting occurred and did not offer any alternative theories as to the identity of the person who shot M.B. and caused A.L.'s death.[6] Most significantly, Mr. Fitzgerald and M.B. both provided unwavering in-court identifications of Mr. Payne as the gunman who fired multiple rounds of ammunition out the black Lincoln's window on August 23, 2020, striking M.B. in the abdomen. (*See* Tr. Vol. III at 215-16, 288.) Thus, even in the absence of the performance errors Mr. Payne alleges occurred at trial, we do not believe, given the

---

[6] Of course, Mr. Payne was not required to present any evidence or alternative theories at trial. It is a foundational principle that, in a criminal prosecution, the state must prove every element of an offense beyond a reasonable doubt and the defendant is not required to disprove any essential element of the offense. *See, e.g.*, R.C. 2901.05(A); *State v. Martin*, 21 Ohio St.3d 91, 94 (1986); *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 191, citing *United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir.1993). But, in the absence of an alternative defense theory or evidence meaningfully contradicting the state's case, we find it difficult to reach a conclusion that Mr. Payne was prejudiced by these alleged errors.

overwhelming evidence of his guilt, it is reasonably probable the outcome of Mr. Payne's trial would have been different.

{¶ 100} Based on the foregoing, we find Mr. Payne is unable to demonstrate ineffective assistance of counsel. Accordingly, we overrule his fifth assignment of error.

### C. Third Assignment of Error: Prosecutorial Misconduct

{¶ 101} In his third assignment of error, Mr. Payne cites several instances of alleged prosecutorial misconduct during trial. Because defense counsel did not object to any of the prosecutor's actions during trial, he has forfeited all but plain error review of this claim. *See* Crim.R. 52(B); *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

{¶ 102} We review prosecutorial misconduct allegations by considering "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The test is whether the conduct was improper and, if so, whether it prejudicially affected the defendant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). A judgment will not be reversed when it is clear beyond a reasonable doubt that absent the prosecutor's remarks, the jury would have found the defendant guilty. *Id.* at 15.

{¶ 103} Moreover, prosecutorial misconduct must be considered within the context of the entire trial. *State v. Keenan*, 66 Ohio St.3d 402, 410 (1993). Thus, "[n]ot every intemperate remark by counsel can be a basis for reversal." *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990), citing *State v. Maurer*, 15 Ohio St.3d 239, 267 (1984). The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶ 104} Mr. Payne first argues the state committed misconduct through its "intentional, tactical use of inadmissible evidence of [Mr.] Payne's propensity to commit crimes." (Appellant's Brief at 30.) More precisely, he takes issue with the state's presentation of evidence about the firearm and high-capacity magazine recovered when he was arrested in October 2020, notwithstanding the fact that such evidence was relevant— and indeed, necessary—to proving the improper handling of a firearm offense decided by the jury. Of course, had these counts been severed from trial, then Mr. Payne's argument

might be compelling. However, because they were not, this prosecutorial misconduct claim lacks merit.

{¶ 105} Mr. Payne also, again, takes issue with the state's "introduction" of evidence indicating Mr. Fitzgerald suspected, at least around the time of the August 2020 drive-by shooting, that Mr. Payne may have been involved in the murder of Brice. But, as already discussed in our analysis of Mr. Payne's first assignment of error, it was defense counsel— not the trial prosecutors—who first brought up such allegations during Mr. Fitzgerald's cross-examination. Surely, actions of defense counsel cannot be attributed to the state. Nor can Detective Lemmon's unsolicited and unexplored brief testimony about the same. To the extent Mr. Payne contends it was improper for the trial prosecutor to reference this matter during closing arguments, we note that parties generally have wide latitude in their closing statements, particularly "as to what the evidence has shown and what inferences can be drawn from the evidence." *Diar* at ¶ 213. *See also State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 159 ("A prosecutor may state an opinion if based on evidence presented at trial."). Thus, unless it appears the state "deliberately attempt[ed] to influence and sway the jury by a recital of matters foreign to the case"—which we find no basis to find in this case—remarks made during closing arguments cannot form the basis of a misconduct claim. *See Maggio v. Cleveland*, 151 Ohio St. 136, 140-41 (1949) (regarding opening statements); *Drake v. Caterpillar Tractor Co.*, 15 Ohio St.3d 346, 347-48 (1984) (applying the holding in *Maggio* to closing arguments). Because the state was commenting on evidence presented at trial and Mr. Payne fails to show plain error when his trial counsel opened the door to the introduction of such evidence, we reject this prosecutorial misconduct claim.

{¶ 106} Mr. Payne next contends the trial prosecutors committed prosecutorial misconduct by introducing what he believes was inadmissible victim-impact evidence during trial. But, as already explained in our analysis of his fourth assignment of error, even assuming the challenged victim-impact evidence should have been excluded from trial, when considered within the context of the entire trial, Mr. Payne fails to establish that, absent the prosecutor's remarks, the outcome of trial would have been different. As such, his second prosecutorial misconduct claim is likewise not well-taken.

{¶ 107} Finally, Mr. Payne argues the trial prosecutor improperly vouched for the credibility of the state's witnesses. As a general matter, an attorney may not express a personal belief or opinion as to the credibility of a witness. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 197, quoting *State v. Williams*, 79 Ohio St.3d 1, 12 (1997). Improper vouching occurs when a prosecutor implies knowledge of facts outside the record or places her or his personal credibility in issue. *See, e.g., State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, ¶ 145; *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 117.

{¶ 108} Here, the prosecutor told the jury during closing arguments that Mr. Lee, Ms. Hanks, and O.A. were scared to testify not just because of the general stress from witnessing and reliving a violent crime, but because Mr. Payne had threatened them. No evidence at trial supported these claims, and it was improper for the prosecutor to make these comments.

{¶ 109} Regarding Mr. Lee, one trial prosecutor told the jury the following:

> Let's talk a little bit about [Mr. Lee]. He was about as jittery as my colleague said he would be. ***He was pretty scared on the stand***. Wouldn't you say?
>
> I just saw his face, and I thought, you know, for him to come in, it was a huge thing. We talked with him several times before the trial, and every time he expressed how scared he was. You heard him on the stand say that he was more afraid of getting shot than getting charged with a drive-by shooting. Why?
>
> Because he heard Christopher Payne say in front of him to his own girlfriend, Christopher Payne's own girlfriend, ["][Y]ou say anything about this, I'll kill you.["] So he was terrified.
>
> But he came, and I was amazed he came because I would be in fear for my life if I knew what he knew.

(Emphasis added.) (Tr. Vol. V at 508-09.) Yet, during opening remarks, the other trial prosecutor told the jury that Mr. Lee's expected nervousness could be attributed to the fact that Mr. Lee's "worst fear" is talking in front of people. (Tr. Vol. III at 187.) While it is true that Mr. Lee generally testified he was afraid of "[g]etting shot" if he got "mixed in" with police, he repeatedly denied that Mr. Payne ever threatened him or told him not to speak with police. (Tr. Vol. III at 253, 252.)

{¶ 110} More broadly, we note the trial prosecutors intimated to the jury their belief that Mr. Lee, Ms. Hanks, Mr. Fitzgerald, and O.A. testified credibly by emphasizing during closing arguments that these witnesses did not want to talk to police about this incident or to testify at trial—the corollary being that, given their reluctance, these witnesses must be telling the truth. (*See* Tr. Vol. V at 533-34.) Having thoroughly reviewed the record, we recognize the trial prosecutors misrepresented some aspects of the testimony elicited from these witnesses on this matter, which was improper.

{¶ 111} But, contrary to Mr. Payne's contention otherwise, we do not find fault in the trial prosecutor's statement indicating he had "no doubt that [Mr. Payne] shot his own car, that that bullet strike - - this is the window, that that bullet strike is going in this direction and then down to this direction" (*see* Tr. Vol. V at 546-47), as it was based on Detective Lemmon's unobjected-to testimony regarding the bullet.

{¶ 112} Notwithstanding our determination that the trial prosecutors inaccurately represented the testimony of some witnesses and may have improperly expressed credibility opinions, Mr. Payne cannot establish these errors prejudiced his substantial rights. This is because, given the overwhelming—and predominately unrefuted—evidence of Mr. Payne's guilt described above, "it appears clear beyond a reasonable doubt that the jury would have found [Mr. Payne] guilty even without the improper comments" by the trial prosecutors. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 121.

{¶ 113} Based on the foregoing, we overrule Mr. Payne's third assignment of error.

### D. Sixth Assignment of Error: Consecutive Sentences on Three Firearm Specifications

{¶ 114} In his sixth assignment of error, Mr. Payne concedes the trial court was required to impose two consecutive three-year firearm specification prison sentences under R.C. 2929.14(B)(1)(g), but argues the trial court erred in its exercise of discretion when it imposed a consecutive three-year prison sentence on the third firearm specification. We disagree.

{¶ 115} R.C. 2953.08(G)(2) generally governs our review of felony sentences. *See*, *e.g.*, *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, ¶ 26-42; *State v. Toles*, 166 Ohio St.3d 397, 2021-Ohio-3531, ¶ 7. Under that statute, we are permitted to modify or vacate a sentence only if we clearly and convincingly find either: (1) the record does not support the

sentencing court's findings under certain statutes, including R.C. 2929.14(C)(4); or (2) the sentence is otherwise contrary to law. *Jones* at ¶ 30-39; R.C. 2953.08(G)(2).

{¶ 116} After merger, Mr. Payne was sentenced for one count of murder and two counts of attempted murder (in addition to the unrelated firearms counts). In connection with each of these three counts, he was also convicted of a three-year firearm specification. As such, the trial court was required to impose sentences for two of the firearm specifications pursuant to R.C. 2929.14(B)(1)(g). *See State v. Bollar*, 171 Ohio St.3d 678, 2022-Ohio-4370. Further, the trial court had discretion to impose a sentence on "any or all of the remaining specifications." R.C. 2929.14(B)(1)(g).

{¶ 117} R.C. 2929.14(C)(4), the consecutive sentencing statute, applies to "multiple prison terms [that] are imposed on an offender for convictions of multiple ***offenses***." (Emphasis added.) A specification is a sentencing enhancement, not a separate criminal offense. *State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, ¶ 16. By its own terms, R.C. 2929.14(C)(4) does not apply to penalty enhancing specifications.

{¶ 118} In relevant part, the trial court sentenced Mr. Payne to the statutory prison sentence for the murder count (15 years to life), definite prison sentences for each of the 2 attempted murder counts, and to all 3 of the 3-year firearm specifications of which he was found guilty. The trial court further ordered the sentences imposed for the murder count, one of the attempted murder counts, and all of the firearm specifications to be served consecutively.

{¶ 119} Because R.C. 2929.14(B)(1)(g) specifically applies to penalty enhancing specifications, this statute controls our analysis. Thus, to prevail on his sixth assignment of error, Mr. Payne must show the trial court plainly erred in imposing sentence on all three 3-year firearm specifications. Yet, R.C. 2929.14(B)(1)(g) does not require the sentencing court to make findings of any kind before ordering a third penalty enhancing specification to be served consecutively. And because the trial court's decision to impose the third penalty enhancing specification was a discretionary determination permitted by R.C. 2929.14(B)(1)(g), we cannot find its imposition was contrary to law.

{¶ 120} For these reasons, we overrule Mr. Payne's sixth assignment of error.

## IV. ANALYSIS OF THE STATE'S CROSS-ASSIGNMENT OF ERROR

{¶ 121} On cross-appeal, the state contends the definite prison term imposed by the trial court for the two attempted murder counts, Counts 5 and 7, was contrary to law. We agree.

{¶ 122} The Reagan Tokes Law, effective March 22, 2019, amended 50 sections of the Ohio Revised Code and adopted four new sections. *See* 2018 Am.Sub.S.B. No. 201. In general, the law provides that first-degree and second-degree felonies not already carrying a life sentence are subject to an indefinite sentencing scheme. *State v. Hacker*, 173 Ohio St.3d 219, 2023-Ohio-2535, ¶ 7, citing R.C. 2929.14(A)(1)(a) and (2)(a). Specifically, it requires a sentencing court to impose a stated minimum sentence as provided in R.C. 2929.14(A)(2)(a) and an accompanying maximum term as provided in R.C. 2929.144 for non-life-sentence felony offenses of the first or second degree committed on or after March 22, 2019.

{¶ 123} R.C. 2967.271 specifies how the minimum and maximum prison terms affect the amount of time a defendant sentenced under the Reagan Tokes Law will be incarcerated. Generally, there is a rebuttable presumption that a defendant will be released from prison after serving the minimum term imposed by the sentencing court. *See* R.C. 2967.271(B). But the Ohio Department of Rehabilitation and Correction ("ODRC") "may rebut [that] presumption" if it—being the ODRC—"determines, at a hearing" that one of the conditions specified in R.C. 2967.271(C) applies. In that event, the ODRC "may maintain the offender's incarceration" up to the maximum prison term set by the sentencing court. R.C. 2967.271(D)(1).

{¶ 124} Concerns about the constitutionality of the new law arose in Ohio's common pleas courts shortly after its enactment. *See, e.g.*, *State v. O'Neal*, 1st Dist. No. C-190736, 2022-Ohio-3017 (reversing trial court's decision refusing to impose indefinite sentence based on its finding that the indefinite sentencing provisions of the Reagan Tokes Law violated the constitutional safeguards of procedural due process and separation of powers); *State v. Simmons*, 8th Dist. No. 109476, 2021-Ohio-939 (same).

{¶ 125} The two attempted murder offenses for which Mr. Payne was convicted occurred in August 2020, are first-degree felonies, and are not subject to the possibility of a life prison sentence. *See* R.C. 2929.14(A)(1), 2923.02(E). Thus, the offenses were subject

to indefinite sentencing under the Reagan Tokes Law. *See* 2018 Am.Sub.S.B. No. 201 (effective March 22, 2019). At the sentencing hearing, however, the trial court noted it had previously found the Reagan Tokes Law to be unconstitutional on the grounds cited in *State v. Hursey*, Franklin C.P. No. 20CR-4459, 2021 Ohio Misc. LEXIS 101 (Aug. 6, 2021), and expressly adopted and incorporated that finding into its sentencing determination in this case. (*See* Tr. Vol. VII at 640-41; May 15, 2023 Jgmt. Entry at 2-3.)

{¶ 126} Based on that holding, and over the state's objection, the trial court sentenced Mr. Payne to a ***definite*** prison term of 11 years for the attempted murder of M.B. and a ***definite*** prison term of 10 years for the attempted murder of Mr. Fitzgerald. We note that, at the time of sentencing, neither this court nor the Supreme Court had ruled on the constitutionality of the Reagan Tokes Law.

{¶ 127} While this appeal was pending, however, the Supreme Court issued a decision finding the Reagan Tokes Law to be facially constitutional. *Hacker* at ¶ 41. Pursuant to that decision, we must conclude the definite prison sentences imposed by the trial court for the two attempted murder counts (Counts 5 and 7) are contrary to law.

{¶ 128} Accordingly, the state's sole cross-assignment of error is sustained.

## V. CONCLUSION

{¶ 129} Having overruled Mr. Payne's six assignments of error and sustained the state's sole cross-assignment of error, we vacate the definite prison sentences imposed for Counts 5 and 7 and remand this matter to the Franklin County Court of Common Pleas for a resentencing hearing in accordance with the Reagan Tokes Law.

*Sentence vacated*; *cause remanded*.

LUPER SCHUSTER and JAMISON, JJ., concur.